# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ROBERT JAMES WARRICK,

  *Plaintiff,*

*v.*         CASE NO. 11-CV-12472

COMMISSIONER OF     DISTRICT JUDGE PAUL D. BORMAN
SOCIAL SECURITY,     MAGISTRATE JUDGE CHARLES E. BINDER

  *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II. REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, disability insurance

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

benefits ("DIB"), and for supplemental security income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11,12.)

Plaintiff was 29 years of age at the most recent administrative hearing. (Transcript, Doc. 6 at 33, 146, 148.) Plaintiff's employment history includes work as a cook, cashier, and laborer from 1997 through 2005. (Tr. at 160.) Plaintiff filed the instant claims on December 3, 2007, and December 10, 2007, alleging that he became unable to work on December 6, 2005. (Tr. at 146, 148.) The claims were denied at the initial administrative stages. (Tr. at 89, 90.) In denying Plaintiff's claims, the Commissioner considered anxiety-related disorders, schizophrenia, paranoia, and other psychotic disorders as possible bases for disability. (*Id.*) On December 8, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Timothy C. Scallen, who considered the application for benefits *de novo*. (Tr. at 4-23, 33-84.) In a decision dated February 4, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 4-19.) Plaintiff requested a review of this decision on February 17, 2010. (Tr. at 29.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on December 22, 2010, when the Appeals Council denied Plaintiff's request for review. (Tr. at 24-28.) On June 8, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party”);

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

## C.     Governing Law

The “[c]laimant bears the burden of proving his entitlement to benefits.” *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, “DIB and SSI are available only for those who have a ‘disability.’” *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). “Disability” means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner’s regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that “significantly limits . . . physical or mental ability to do basic work activities,” benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2011, and that Plaintiff had not engaged in substantial gainful activity since December 6, 2005, the alleged onset date. (Tr. at 10.) At step two, the ALJ found that Plaintiff's bipolar disorder/schizoaffective disorder was "severe" within the meaning of the second sequential step.

(Tr. at 11.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 11-13.) At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (Tr. at 17.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual, age 18 to 44. (Tr. at 18.) At step five, the ALJ found that Plaintiff could perform a full range of work at all exertional levels with the following nonexertional limitations: simple routine repetitive tasks in a low-stress environment; no interaction with co-workers except as incidental to the employment itself; no interaction with the general public; and no production rate work. (Tr. at 13-17.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 19.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has been treated for mental health issues since 1997. (Tr. at 381.) On December 14, 2002, Plaintiff was admitted into the St. John Macomb Hospital "on a police petition" after assaulting his father; he was described as "acutely psychotic." (Tr. at 378, 380.) Plaintiff was diagnosed with paranoid schizophrenia and he exhibited "paranoid ideations, delusions, some mood swings, and was becoming sort of manic." (*Id.*) Plaintiff tested positive for cannabinoids and admitted smoking up to five to ten joints every day, using crack cocaine about once a week, and binge drinking until he could not walk. (Tr. at 382.) Plaintiff was discharged on January 4, 2003. (Tr. at 378.) Susan Schwartz, M.S.W., identified Plaintiff's problems as Psychotic Disorder, NOS, strong family history of substance abuse and chronic polysubstance abuse, severe, especially cocaine, alcohol, and marijuana. (Tr. at 384.) On December 14, 2002, Bal K. Gupta, M.D., diagnosed paranoid schizophrenia with inappropriate behavior. (Tr. at 387.) A CT scan of Plaintiff's head taken on December 18, 2002, was normal. (Tr. at 385.)

On June 20, 2004, Plaintiff sought treatment in the emergency room of St. Joseph's Mercy of Macomb Hospital after having used a "'line and a half of cocaine today'" and having an anxiety attack. (Tr. at 391, 393, 395.) An EKG taken that day was "normal." (Tr. at 401.) On June 24, 2004, Plaintiff was readmitted and diagnosed with bipolar disorder mixed with psychotic features. (Tr. at 403-04.) He was discharged on July 1, 2004. (*Id.*)

Plaintiff was treated at St. Joseph Mercy of Macomb from July 2004 through November 2005. (Tr. at 446-85.) Plaintiff then was treated at Macomb County Community Mental Health ("MCCMH") from October 2005 through September 2009. (Tr. at 530-643, 644-61, 685-746.)

Plaintiff was referred for a consultative examination with Disability Determination Services ("DDS") physician F. Qadir, M.D., Psychiatrist, on March 31, 2006. (Tr. at 486-88.) Dr. Qadir diagnosed "bipolar disorder; in partial remission," assessed a GAF score of 52, and gave a "guarded" prognosis. (Tr. at 488.)

A Psychiatric Review Technique completed on April 12, 2006, diagnosed Plaintiff with affective disorders, i.e., "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by with or both syndromes)[.]" (Tr. at 490, 493.) The assessment found that Plaintiff had no limitations in activities of daily living or in maintaining social functioning, but was moderately limited in maintaining concentration, persistence or pace. (Tr. at 500.)

A Mental Residual Functional Capacity ("RFC") Assessment completed on April 12, 2006, concluded that Plaintiff was not significantly limited in the ability to remember locations and work-like procedures or the ability to understand and remember very short and simple instructions, but was moderately limited in the ability to understand and remember detailed instructions. (Tr. at 504.) Plaintiff was also found to be not significantly limited in his abilities to carry out very

short and simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine, work in coordination with others, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods, but was found to be moderately limited in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (Tr. at 504-05.) Plaintiff was found to be not significantly limited in any areas of social interaction or adaptation except for moderate limitations in the ability to set realistic goals or make plans independently of others. (Tr. at 505.) The assessment concluded that Plaintiff "retains the mental capacity to perform simple unskilled tasks on a sustained basis." (Tr. at 506.)

Plaintiff was again referred for a consultative examination with DDS physician Dr. Qadir, on May 4, 2007. (Tr. at 508-10.) Dr. Qadir diagnosed "[b]ipolar disorder; mixed type[,]" "[h]istory of marijuana abuse" and "[p]ersonality disorder, NOS[,]" assessed a GAF score of 48 and gave a guarded prognosis. (Tr. at 510.)

Another Mental RFC Assessment completed on May 24, 2007, concluded that Plaintiff was not significantly limited in the ability to remember locations and work-like procedures or the ability to understand and remember very short and simple instructions, but was moderately limited in the ability to understand and remember detailed instructions. (Tr. at 512.) Plaintiff was also found to be not significantly limited in his abilities to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine, work in coordination with others, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods, but was

found to be moderately limited in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (Tr. at 512-13.) Plaintiff was found to be not significantly limited in any areas of social interaction or adaptation except for moderate limitations in the ability to interact appropriately with the general public and the ability to set realistic goals or make plans independently of others. (Tr. at 513.) The assessment concluded that Plaintiff "retains the mental capacity to understand, remember, maintain concentration, pace, get along with others, respond to changes in order to complete simple unskilled tasks." (Tr. at 514.)

Another Psychiatric Review Technique completed on May 24, 2007, diagnosed Plaintiff with affective disorders, i.e., "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by with or both syndromes)" and substance abuse addiction disorders. (Tr. at 516, 519, 524.) The assessment found that Plaintiff was mildly limited in activities of daily living and in maintaining social functioning, but was moderately limited in maintaining concentration, persistence or pace. (Tr. at 526.)

In December 2006, Egard Pedraza, M.D., of MCCMH, diagnosed psychotic disorder, NOS and polysubstance dependence and assessed a GAF score of 45. (Tr. at 572.) In January, February, September, October, November and December of 2007, Dr. Pedraza diagnosed schizoaffective disorder and polysubstance dependence, and assessed a GAF score of 41. (Tr. at 535, 540, 545, 550, 557, 562, 567.)

Plaintiff was again referred for a consultative examination with DDS physician Michael Matouk, M.D., on February 28, 2008. (Tr. at 662-66.) Dr. Matouk diagnosed "[s]chizoaffective [s]isorder" and "[o]bsessive-compulsive [d]isorder," assessed a GAF score of 42, and gave a prognosis of fair to poor. (Tr. at 666.)

Another Psychiatric Review Technique completed on March 17, 2008, diagnosed Plaintiff with schizophrenic, paranoid or other psychotic disorders, and with anxiety-related disorder, i.e. "OCD." (Tr. at 667, 669, 672.) The assessment found that Plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. at 526.)

Another Mental RFC Assessment completed on March 17, 2008, concluded that Plaintiff was not significantly limited in the ability to remember locations and work-like procedures or the ability to understand and remember very short and simple instructions, but was moderately limited in the ability to understand and remember detailed instructions. (Tr. at 681.) Plaintiff was also found to be not significantly limited in his abilities to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine, work in coordination with others, and make simple work-related decisions, but was found to be moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 681-82.) Plaintiff was found to be not significantly limited in any areas of social interaction or adaptation except for moderate limitations in the ability to interact appropriately with the general public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 682.) The assessment concluded that Plaintiff "retains the mental capacity to engage in simple work activity." (Tr. at 683.)

In his daily function report, Plaintiff indicated that he takes care of a pet bird and a dog, "sleep[s] in a lot" because of his medication, has no problems with personal care, needs reminders

for appointments, makes his own meals daily, does yard work, cleans the gutters on his house, goes outside every day, walks, drives a car, shops in stores, handles his finances, does drawings, watches movies, hangs out with his son, and goes to Narcotics Anonymous meetings. (Tr. at 178-82, 215-18.)  Plaintiff indicated that he was been fired from a job "because of drugs and not working out for the company." (Tr. at 183.)

At the administrative hearing, Plaintiff testified that he is currently receiving Risperdal injections every two weeks through MCCMH. (Tr. at 38-39.) Plaintiff added that the only side effect he experiences is being "mellow and tired." (Tr. at 40.) Plaintiff testified that he had not used marijuana for five months and had been sober for longer than that, and that he had been attending Narcotics Anonymous ("NA") meetings for eight years. (Tr. at 41-42.) When asked if he could feel any difference from being off alcohol and controlled substances, Plaintiff responded, "tremendous difference." (Tr. at 42.) Plaintiff stated that he is "[c]lear headed" and "[m]ore capable of doing things." (*Id.*) Plaintiff also noted that his medication is more effective when he is not abusing substances because nothing "interfere[s]" with his treatment. (*Id.*)

Plaintiff testified that he had been doing roofing work "on and off, I'd say for like a year or two." (Tr. at 43.) Plaintiff indicated he worked during the summer months for "[a] good eight hours" a day and earned approximately $1,500 per year. (Tr. at 43-44, 46.) Since 2007, Plaintiff has lived in an apartment where his rent is paid by working for the landlord at the landlord's golf course. (Tr. at 47.) Plaintiff stated that he "call[s] him every morning and then we go from there." (*Id.*) When Plaintiff works for his landlord, he works all day. (Tr. at 50.) Plaintiff stated that he "would always tell him that I was going to try to get a job" but he'd "always not end up keeping it or getting it." (Tr. at 49.)

Plaintiff further testified that he keeps things clean, does dishes and laundry and that he "feel[s] really good on the meds." (Tr. at 54.) Plaintiff added that sometimes he just gets "kind of bummed" and thinks "about all the finances and everything. I just kind of just lay there. I figure what else is there to do?" (Tr. at 56.) When asked why he cannot work, Plaintiff responded,

> Well, I don't - - I think it has a lot to do with my nerves and thinking I'm getting messages. But, for the most part, I think - - I get into a job and I think that people are already talking about me and saying 'That's the guy,' and all this. And bad reputation. And for, like, the twitches and stuff like that.

(Tr. at 59.) The ALJ asked whether Plaintiff meant the twitch with his mouth and Plaintiff responded affirmatively and indicated he has had the twitch since 2005. (*Id.*) Plaintiff noted that at work in the past, he would "end up poking people or something or thinking they're giving me information or something," but that since he's " been on the new medication it's been a lot better." (Tr. at 60.)

Plaintiff's mother also testified and stated that Plaintiff "has very low self-esteem, and he would like to think that he can work . . . [but] he needs constant supervision to have him do the smallest of tasks." (Tr. at 76.) She indicated that she gets frustrated because if she asks him, for example, to put things "in the garage right by where the wood is," she will find the things instead placed "way over on the other side[.]" (*Id.*) She testified that she was "afraid of him" in the past, but noted that he was "getting a lot better now, with this injection." (Tr. at 77.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider a person with Plaintiff's background who was "capable of doing simple, routine, repetitive tasks in a low stress environment and required only occasional interaction with the public and coworkers." (Tr. at 81.) The VE responded that such a person could do Plaintiff's past general laborer jobs. (*Id.*) The ALJ's next hypothetical assumed a person with Plaintiff's background who could do "simple, routine, repetitive tasks, low stress environment, I'll say no production rate work, no interaction

with the public, and no interaction with coworkers, except as, you know, incidental to the employment itself." (Tr. at 82.) The VE responded that such a person could not perform Plaintiff's past work but could perform the 4,000 unskilled medium janitor jobs, the 3,000 unskilled light bench assembler non-production-oriented jobs, and the 3,000 unskilled light stock clerk jobs available in the Southeast Michigan area. (*Id.*) If close supervision, i.e., with the supervisor watching the person at least two-thirds of the day, were added, employment would be precluded. (Tr. at 83.)

### F. Analysis and Conclusions

#### 1. Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a full range of work at all exertional levels with the nonexertional limitation that he required a job that provided for routine production and stress, simple job assignments, unskilled jobs, and occasional contact with the public and co-workers. (Tr. at 13-17.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

#### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 8.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833;

*Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ's credibility findings are not supported by substantial evidence and that the RFC assessment and conclusion that Plaintiff is capable of performing substantial gainful activity is not supported by substantial evidence. (Doc. 11 at 20-24.) Plaintiff also contends that the ALJ did not properly assess the treating source opinions of Drs. Pedraza, Qadir and Matouk, "each of whom opined, via their assessment of the client's Global Assessment of Functioning scores, that Robert had 'severe symptoms.'" (Doc. 11 at 23.) In addition, Plaintiff requests a sentence six remand to allow evidence submitted pursuant to an April 2020 application that resulted in a June 2011 favorable decision. (Doc. 11 at 7, 24-25.)

### a.    GAF Scores

Contrary to Plaintiff's argument, GAF scores are not medical opinions; thus, the ALJ's rejection of GAF scores was not error and has no bearing on the weight ALJs accord treating source opinions. In fact, neither the Commissioner nor the Sixth Circuit requires that GAF scores be given any weight at all:

> [T]he Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.

*Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). Therefore, I suggest that the ALJ's decision not to rely on the GAF scores is of little consequence and does not undermine the ALJ's substantial evidence finding. *See Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because

it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 Fed. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

### b. RFC Assessment

Although the record evidence establishes that Plaintiff suffers from mental illness, the evidence also consistently establishes that he is capable of doing simple work. There is no medical opinion contradicting the RFC assessments, all of which consistently conclude that despite his impairments, Plaintiff is capable of performing simple tasks. (Tr. at 506, 514, 683.)

The ALJ properly incorporated the limitations specified in the RFC assessments when he limited the work to "simple, routine, repetitive tasks, low stress environment, I'll say no production rate work, no interaction with the public, and no interaction with coworkers, except as, you know, incidental to the employment itself." (Tr. at 82.) Plaintiff's testimony at the administrative hearing indicates that since he has been on Risperdal. he has been "a lot better" with respect to the behavior issues that prevented him from keeping a job. (Tr. at 60.) Plaintiff also testified that he "feel[s] really good on the meds." (Tr. at 54.) Plaintiff added that since he has stopped abusing substances, he has seen a "tremendous difference" and is "[c]lear headed" and "[m]ore capable of doing things." (Tr. at 42.)

Finally, I suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that he is able to take care of a pet bird and dog, has no problems with personal care, needs reminders for appointments, makes his own meals daily, does yard work, cleans the gutters on his house, goes outside every day, walks, drives a car, shops in stores, handles

his finances, does drawings, watches movies, hangs out with his son, and goes to NA meetings. (Tr. at 178-82, 215-18.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### c. Sentence Six Remand

Plaintiff seeks remand under sentence six to introduce an April 2011 "Situational Work Assessment Report" from Jewish Vocational Services and MCCMH records dated August 14, 2008, through November 24, 2009. (Doc. 11 at 24-25, Exs. 1 and 2.)

Sentence six of 42 U.S.C. § 405(g) allows the district court to remand in light of additional evidence without making any substantive ruling as to the merits of the Commissioner's decision, but only if a claimant can show good cause for failing to present the evidence earlier. *Melkonyan v. Sullivan*, 501 U.S. 89, 100, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991). The Sixth Circuit has long recognized that a court may only remand disability benefits cases when a claimant carries his burden to show that "the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is only "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (citing *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001)). In addition, "such evidence is 'material' only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357.

"'Good cause' is shown for a sentence six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability.'" *Payne v. Comm'r of Soc. Sec.*, No. 1:09-cv-1159, 2011 WL

811422, at *12 (W.D. Mich. Feb. 11, 2010) (finding evidence generated after the hearing and submitted to the Appeals Council for the purpose of attempting to prove disability was not "new").

As to the MCCMH records, Plaintiff asserts that although the records are not part of the administrative record, Plaintiff's counsel "did submit them" and she "does not understand why they were not part of the Exhibit File." (Doc. 11 at 25.) Plaintiff contends that "a review of the exhibits themselves reflect a date of December 6, 2009, as the date they were forwarded to plaintiff's counsel; these same records were submitted to the Administrative Law Judge prior to the hearing held February 4, 2010." (Doc. 11 at 25.)

Although the date on the exhibits does show that the records were forwarded to Plaintiff's counsel, there is no proffer of evidence to show that Plaintiff's counsel forwarded such records to the ALJ or the Commissioner. Plaintiff does not offer a copy of a cover letter sent to the Commissioner or any other business record, notation, proof of postage, fees charged for doing so, etc., tending to support counsel's claim that counsel did not simply neglect to forward the records to the ALJ or the Commissioner. I note that the medical evidence in the administrative record includes records submitted from MCCMH dated October 2005 through December 2007 (Tr. at 530-661) and dated October 2006 through September 2009. (Tr. at 685-746.) I further note that the ALJ attempted to ensure that the administrative record was complete by inquiring about records from MCCMH at the administrative hearing. (Tr. at 36-38.)

Plaintiff's own explanation reveals that the MCCMH records were available at the time of the hearing and, thus, are not new. I suggest that Plaintiff's proof that the records were received by Plaintiff's counsel without any evidence suggesting they were actually sent to the ALJ or Commissioner does not rise to the level of good cause. This is especially so in light of counsel's failure to assure such records were actually received at the time of the hearing when the ALJ

specifically inquired about records from MCCMH. Finally, since the records are simply more notations of persons executing Plaintiff's person-centered treatment plan which are already contained in the record (Tr. at 685-746), the proffered records are merely cumulative. Thus, I suggest that the records are not material, and that Plaintiff is not entitled to a sentence six remand regarding the MCCMH records.

As to the "Situational Work Assessment Report," this report is new in the sense that it was not in existence at the time of the hearing; however, since it is not evidence of continued treatment but rather an assessment generated to prove disability, I suggest that good cause does not exist to permit a remand. *See Payne, supra.* I therefore suggest that Plaintiff is not entitled to a sentence six remand regarding the "Situational Work Assessment Report."

To the extent that Plaintiff is implying that he is entitled to remand based on the favorable decision he received in June 2011, the Sixth Circuit has held that a subsequent favorable decision does not constitute new and material evidence under section 405(g). *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646 (6th Cir. 2009). In so holding, the Sixth Circuit expressly noted several district court decisions which had "misapplied" the § 405(g) standard. *Id.* The Sixth Circuit reasoned that the "only way [a subsequent decision] might change the outcome of the initial proceeding is by the power of its alternative analysis of the same evidence [b]ut remand under sentence six is not meant to address the 'correctness of the administrative determination' made on the evidence already before the ALJ." *Id.* (quoting *Melkonyan,* 501 U.S. at 100). The Sixth Circuit also found that "[t]o the extent that [a plaintiff] argues that remand is appropriate based on the *possibility* of new and material evidence, this contradicts the clear language of § 405(g) that requires a '*showing* that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Id.* (emphasis in original).

Accordingly, I suggest that a remand under sentence six would be inappropriate and that Plaintiff's motion for summary judgment should be denied on this ground as well.

### 3.    Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.


## III.    REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ **Charles E. Binder**
CHARLES E. BINDER
Dated: May 2, 2012                                             United States Magistrate Judge

**<u>CERTIFICATION</u>**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: May 2, 2012                         By      s/Patricia T. Morris
                                                                      Law Clerk to Magistrate Judge Binder